**In re Joseph J. LIPPOLIS a/k/a Joseph Lippolis, Christine A. Lippolis a/k/a Christine Lippolis, Debtors.**

**Bankruptcy No. 97–33906DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 12, 1997.

Lawrence B. Schwartz, Lansdowne, PA, for Debtors.

William J. Levant, Lesser & Kaplin, P.C., Blue Bell, PA, for Equity One, Inc.

Joseph Minni, Office of U.S. Trustee, Philadelphia, PA, for U.S. Trustee.

Edward Sparkman, Philadelphia, PA, for Standing Chapter 13 Trustee.

Marie E. Truitt, Levittown, PA, Interested Party pro se.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The instant contested matter presents the issue of whether non-mortgagor debtors who are deeded real estate shortly before filing bankruptcy may reasonably attain confirmation of a Chapter 13 plan wherein they propose to step into the shoes of the mortgagor and cure the mortgage arrears. We believe that they can, in light of pertinent Pennsylvania law protecting the rights of "terre tenants" and 1994 Bankruptcy Code amendments broadening debtors' rights to cure mortgage defaults. Therefore, while the seemingly contrived manner in which the Debtors obtained an interest in the realty in issue causes us to impose certain conditions on the Debtors' future performance in this case through confirmation to protect the mortgagee, the request of the mortgagee for unconditional relief from the automatic stay, and of that party, the United States Trustee ("the U.S. Trustee"), and possibly the Standing Chapter 13 Trustee ("the Trustee") for dismissal of this case on the ground that it was filed in "bad faith" will be denied.

### B. PROCEDURAL AND FACTUAL HISTORY

On July 28, 1995, Marie E. Truitt, the mother of co-debtor JOSEPH J. LIPPOLIS ("the Husband"), obtained a mortgage from Equity One, Inc. ("Equity") in the amount of $118,000, the proceeds of which Truitt used to purchase a home situated at 63 Roving Road, Levittown, Pennsylvania ("the Premises"), for approximately $132,000. The Premises is apparently quite large because, as the

parties anticipated at the time of the purchase, it served as a home not only for Truitt, but also for the Husband, his wife, co-debtor CHRISTINE A. LIPPOLIS ("the Wife;" with the Husband, "the Debtors"), the Debtors' six dependent children, and their grandchild.

The Wife testified at the hearing of December 11, 1997, on the motion of Equity to dismiss this case or obtain relief from the automatic stay to foreclose on the Premises which is before us ("the Motion") that it was agreed that the Debtors would make all or most of the mortgage payments to Equity. She further testified that, shortly after the home purchase, Truitt obtained employment in New Jersey and moved to the home of another son in that state, although she continued to frequently visit and receive her mail at the Premises. The Debtors and their family have resided in the Premises at all times since its purchase.

Mortgage payments of $1,108.98 monthly became seriously delinquent, and are presently 21 months in arrears according to Equity's witness at the hearing, "asset specialist" Suzanne Petrone. The Wife attributed the delinquency to spinal and hip injuries suffered by the Husband and bad weather, which prevented him from working in his self-owned contracting business for a considerable period, although she implied that the Debtors' financial difficulties had abated.

On October 15, 1996, Truitt filed a Chapter 13 bankruptcy case at Bankr. No. 96–17667 in the District of New Jersey ("the N.J. Case"). Although a plan was confirmed in the N.J. Case on March 5, 1997, the payments became delinquent, Equity filed a motion for relief, and a Consent Order was entered on May 12, 1997, which apparently allowed Equity to obtain *ex parte* relief if further payments were missed. A delinquency must have occurred immediately thereafter, because Equity alleges that it obtained relief on May 22, 1992.[1] A sheriff's

---

1. This court rarely, if ever, enters orders which are self-executing upon allegations of defaults by mortgagees of the terms of stipulations settling motion for relief from the automatic stay. Frankly, we have found that too many mistakes are made by mortgagees and, were we to happazardly enter such orders, relief would often have been granted to mortgagees even though necessary payments have been made. We also find the brief period between default and relief in the N.J. Case distressing, if not suspicious. It suggests that Truitt was already in default when

sale of the Premises was scheduled on November 14, 1997.

On November 12, 1997, Truitt filed an application to voluntarily dismiss the N.J. Case, which was granted that same day. On that day she also executed a deed of the Premises to the Debtors. The Wife testified, but did not document, that the deed has been recorded. The Debtors then filed the instant bankruptcy case in this court on November 13, 1997.

Equity, upon advice of this bankruptcy filing, voluntarily stayed the sheriff's sale of the Premises until December 12, 1997.[2] It then filed the instant Motion, requesting that it be heard on an expedited basis prior to December 12, 1997. We scheduled the hearing on December 11, 1997.

On December 1, 1997, the Debtors filed their Schedules and a Chapter 13 Plan ("the Plan") which proposed to remit the regular mortgage payments directly to Equity and cure arrears by remitting payments to the Trustee beginning at $500 monthly and graduated by $50 monthly each year to ultimately reach payments of $700 monthly in the Plan's fifth year.

■■■ The facts established at the December 11, 1997, hearing were basically uncontested. The only unusual aspect of this matter was the active involvement of the U.S. Trustee in support of dismissal of the case and the Trustee's statement that he supported the Motion. Concerned that the participation of these usually-neutral parties bore significance, we asked all interested parties to file briefs supporting the Motion by December 22, 1997, and those opposing it by January 2, 1998. In the interim, we entered an order of December 12, 1997, postponing the sheriff's sale until January 9,

1998, and scheduling a status hearing on January 8, 1998, and also containing provisions which our final orders deciding similar motions involving debtors who had obtained title shortly before or after the bankruptcy filing would ordinarily include, *i.e.*, we conditioned the stay on the Debtors' maintaining payments to Equity and the Trustee and allowed Equity to certify a default which, after a further order of this court, *compare* page 379–380 n.1 *supra*, would support a dismissal of the case with a 180-day bar of any further filing by any party which would stay foreclosure of the Premises.[3] It will be noted that our instant order, after staying the sheriff's sale of the Premises indefinitely, contains the same provisions as the interim order of December 12, 1997, with the 180-day bar limited in duration to the date of confirmation of a Chapter 13 plan by the Debtors.

## C. DISCUSSION

■■■ Equity timely submitted a brief on December 22, 1997. It argued that it was entitled to relief under either 11 U.S.C. §§ 362(d)(1) or 362(d)(2) because the Debtors could not propose a confirmable plan. *See In re Indian Palms Associates, Ltd.*, 61 F.3d 197, 209–212 (3d Cir.1995); *In re Ferrell*, Bankr.No. 97–32994DAS, slip op. at, 1998 WL 10367 (Bankr.E.D.Pa. January 6, 1998); *In re Franklin Pembroke Venture II*, 105 B.R. 276, 277–78 (Bankr.E.D.Pa.1989), and cases cited therein; and *In re Crompton*, 73 B.R. 800, 809–12 (Bankr.E.D.Pa.1987). In support of their arguments on this point, they referenced paragraphs 17 and 18 of the Truitt mortgage, which provide as follows:

17. **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a ben-

---

the Consent Decree was settled and hence that she may have been "set up" for relief by Equity.

**2.** This was a prudent action on Equity's part. *See In re McLaughlin*, 96 B.R. 554 (Bankr. E.D.Pa.), *aff'd*, C.A. Nos. 89–2279, 89–3672, 89–3748 (E.D.Pa. Sept. 18, 1989) (mortgagee who refused to stay a sheriff's sale of a premises deeded to the debtor *post*-petition was held liable for attorneys' fees of $1,000 under 11 U.S.C. § 362(h)).

**3.** This court disfavors bars on future bankruptcy filings because they operate contrary to the principle that a debtor's future bankruptcy-filing rights are generally unenforceable, *see In re Madison*, 184 B.R. 686, 690–92 (Bankr.E.D.Pa.1995), and because they are difficult for the clerk's office to enforce. Conditions on future bankruptcy filings are therefore entered only when necessary to prevent repeated abuse in the future and are always subject to reconsideration. *See id.* at 692–94.

eficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. *However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.*

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. **Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstatement shall not apply in the case of

acceleration under paragraph 17. (emphasis added to facilitate discussion at page 381–382 *infra*).

According to Equity, although the Debtors could possibly present a plan paying off the entire mortgage balance, they had not done so and were incapable of funding such a plan. Rather, the Debtors proposed to cure arrears, a right which Equity argued that only Truitt could assert. They therefore contended that the Debtors would have to convey the Premises back to Truitt to trigger any such right.

Equity then cites to several cases which refuse to allow non-mortgagor grantee-debtors to cure mortgage delinquencies, notably our decision in *In re Taylor*, 96 B.R. 584 (Bankr.E.D.Pa.1989) (a decision by this court actually holding only that the debtor could not invoke 11 U.S.C. § 506(a) in light of his post-petition acquisition of a property; we did not decide that the debtor could not pay off the mortgage at issue and in fact a plan was ultimately confirmed in that case allowing such a result); *In re Nelson*, 66 B.R. 231 (Bankr.D.N.J.1986), *aff'd without opinion*, 838 F.2d 1207 (3d Cir.1988); and *In re Rye*, 54 B.R. 180 (Bankr.D.S.C.1985). Assuming that the Debtors' cure Plan is not confirmable, they further argue that the instant filing was in "bad faith" and justifies dismissal on authority of *In re Lilley*, 91 F.3d 491, 496 (3d Cir.1996), and cases cited therein.

The U.S. Trustee submitted a brief on January 2, 1998. To the prejudice of the Debtors' opportunity to respond, she mistakenly justifies her failure to file her brief on December 22, 1997, the established date for those *supporting any portion of* Equity's position, by stating that she takes no position on the stay relief aspect of the Motion and confines herself to (merely) supporting dismissal of the case. The U.S. Trustee then minimizes prejudice to the Debtors by proceeding to reiterate the arguments and authority of Equity, describing the Truitt-to-Debtors transfer of the Premises and the sequence of these two filings as "a blatant attempt to manipulate the bankruptcy process...that is expressly intended to defeat the good faith requirement of Chapter 13."

Memorandum of Law of United States Trustee Regarding Dismissal of Case, at 7–8.

The Debtors' response to Equity's brief, filed somewhat late on January 2, 1998, argues that the case was not filed in bad faith and that relief under §§ 362(d)(1) or (d)(2) is not warranted because the Plan is confirmable. They make two rather creative responses to Equity's arguments that the deed transfer eliminates the Debtors' ability to cure mortgage defaults: (1) the portion of paragraph 17 of the mortgage emphasized at page 380–381 *supra* eliminates the enforceability of the due-on-sale aspect of this paragraph in light of 11 U.S.C. §§ 362 and 1301 of the Bankruptcy Code, which prohibits Equity's making a demand for immediate payment; and (2) debtors should be accorded the same ability to transfer their rights as mortgagees, who frequently introduce confusion and hence prejudice to mortgagors by assigning *their* rights to other mortgage companies. The Debtors also argue that the tactics utilized by Truitt and them were perfectly lawful and have resulted in only two filings to protect the homestead of a large family to whom the Premises is by all means "necessary" to their reorganization efforts.

From the foregoing, we deduce that the principal issue in dispute is whether the Debtors have a right, under applicable federal bankruptcy law, and where applicable, Pennsylvania state law, to assume and thereby cure the obligations of Truitt to Equity under the mortgage. If they have such a right, we believe that they cannot be said to have proceeded in bad faith in filing this case, thereby justifying dismissal of the case; and they are entitled to the protection of the automatic stay as long as they continue to make current payments to Equity and the Trustee and retain a reasonable prospect of confirming a plan of reorganization.

We begin by referencing the following provisions of 11 U.S.C. § 1322, which addresses the necessary and permissible contents of a confirmable Chapter 13 plan:

(b) Subject to subsections (a) and (c) of this section, the plan may—

. . .

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;

(3) provide for the curing or waiving of any default;

. . .

(5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due;

. . .

(c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy law—

(1) a default with respect to, or that gave rise to, a lien on the debtor's principal residence may be cured under paragraph (3) or (5) of subsection (b) until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law; and

(2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title. . . .

As we indicated in *In re Watson,* 190 B.R. 32, 36 (Bankr.E.D.Pa.1995), 11 U.S.C. § 1322(c) was appended to the Code in 1994, thereby clarifying the ability of debtors to utilize § 1322(b)(3) to cure defaults which some courts had, prior to that time, labeled as modifications of home mortgages which were impermissible under 11 U.S.C. §§ 1322(b)(2) and (b)(5) and perforce impermissible under § 1322(b)(3) as well. We also noted, *id.* at 35–36, that, in *In re Rowe,* 110 B.R. 712, 724 (Bankr.E.D.Pa.1990); *In re Klein,* 106 B.R. 396, 402–04 (Bankr.E.D.Pa. 1989); and *In re Ford,* 84 B.R. 40, 43–44 (Bankr.E.D.Pa.1988), this court had allied itself with the line of cases allowing such a

broad use of § 1322(b)(3) even prior to the enactment of § 1322(c).

While the 1994 addition of the new § 1322(c) overruled the results of *First Nat'l Fidelity Corp. v. Perry*, 945 F.2d 61, 62–67 (3d Cir.1991); and *In re Roach*, 824 F.2d 1370, 1377–79 (3d Cir.1987), that, since New Jersey state law did not authorize a post-judgment cure of a mortgage delinquency, § 1322(b)(2) barred a post-judgment cure, *see Watson, supra*, 190 B.R. at 36; and 8 COLLIER ON BANKRUPTCY, ¶ 1322.09[6], at 1322–36 to 1322–27 (15th rev. ed. 1997), it did not eliminate the significance of state law in determining cure rights, a principle which is also strongly articulated in *Perry* and *Roach*. In fact, the legislative history to § 1322(c)(1) expressly provides that "if the state provides more extensive 'cure' rights [than allowing a cure through the date of sale], ...the debtor will continue to enjoy such rights in bankruptcy." H.R. REP. NO. 835, 103rd Cong., 2d Sess. 52 (October 4, 1994); and 8 COLLIER, *supra*, ¶ 1322.09[6], at 1322–27. And, as we noted in *In re Taras*, 136 B.R. 941, 952–53 (Bankr. E.D.Pa.1992), the *Roach* and *Perry* decisions did not adversely impact the rights of most Pennsylvania debtors because applicable Pennsylvania law specifically provided mortgage debtors with a right to cure mortgage defaults at any time prior to one hour before a sheriff's sale. *See* 41 P.S. § 404.

The decision in *Marra v. Stocker*, 532 Pa. 187, 615 A.2d 326 (1992), expressly extends the right of non-mortgagor grantees situated as are the instant Debtors to cure defaults which have developed in connection with mortgages of their grantors. Specifically, the *Marra* decision states as follows, 532 Pa. at 192–94, 615 A.2d at 328–29:

> As noted previously, Act 6 [41 P.S. § 101, *et seq.*] requires that the residential mortgage lender give notice to the residential mortgage debtor of its intention to foreclose and the right to cure the default thirty days prior to acceleration, or the commencement of any legal proceedings including mortgage foreclosure. 41 P.S. § 403. A residential mortgage debtor is defined in Act 6 as "a non-corporate borrower who is obligated to a residential mortgage lender to repay in whole or in part a residential mortgage *and a successor record owner of the property, if any, who gives notice thereof to the residential mortgage lender*". 41 P.S. § 101 (emphasis added [in original]). In this case the Marras were successor record owners of the property on December 16, 1985, when the property was deeded to them and recorded by the tax claim bureau. On March 12, 1986, the Marras notified the Bank of their ownership of the property. Thus, the Marras were residential mortgage debtors and were entitled to Act 6 notice.

The trial court erred in concluding that "technical compliance" with Act was not required in this case because there was a violation of the due-on-sale clause of the mortgage. The trial court based its ruling upon two Superior Court cases: *Ministers & Missionaries Benefit Board v. Goldsworthy*, 253 Pa.Super. 321, 385 A.2d 358 (1978); and *New Home Federal Savings & Loan v. Trunk*, 333 Pa.Super. 393, 482 A.2d 625 (1984).

. . .

The Superior Court in the preceding cases has engrafted an artificial exception onto an unambiguous legislative notice requirement. The Statutory Construction Act mandates that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Contrary to the Superior Court's interpretation, it is clear that Act 6 notice applies to all defaults, not just monetary; hence, the "*nature* of the default claimed" and "exactly what performance including what sum of money, *if any*, must be tendered to cure the default" must be stated in the notice of intention to foreclose. 41 P.S. § 403(c)(2) and (3) (emphasis added). There is no exception to the notice requirements of Act 6 and to read one into the statute would be to amend it and, thereby, improperly engage in legislating.

We also note additional legislative support for the Debtors' right to slip into the shoes of Truitt, apart from 41 P.S. §§ 403, 404 or

elsewhere in Act 6, arises from 21 P.S. §§ 733 and 734, which provide in pertinent part as follows:

### § 733. Assignment on tender of money due

It shall be lawful for any person or persons, natural or artificial, holding lands encumbered by a mortgagee, judgment, recognizance, or other security, after the same shall become due and payable, his or their agent, attorney, or terre tenant, to tender to the owner or owners of such mortgage, judgment, recognizance, or other security, the full sum of money due thereon, including interest and any other charges due, and, upon such tender, to require the owner or owners to assign and transfer to such person or persons as the owner of the encumbered property may name, such mortgage, judgment, recognizance, or other security. Such assignment shall create no personal liability on the part of the assignor, by way of implied warranty, or otherwise, and any such assignment shall be without recourse.

### § 734. Failure or refusal to assign; court to enforce

In case the holder of any such mortgage, judgment, recognizance, or other security, shall fail or refuse, on such tender being made, to execute an assignment or transfer as required, it shall be the duty of the court of common pleas of the county in which said mortgage, judgment, recognizance, or security is entered, or of the county in which the holder thereof resides, such court sitting in equity, to enforce, by decree and attachment, such assignment and transfer, and to order that the interest due on such mortgage, judgment, or recognizance or other security shall cease from the day of such tender until the assignment shall be executed and delivered....

The Debtors are "terre tenants" of the Premises under state law. *See Marra, supra,* 532 Pa. at 190 n. 4, 615 A.2d at 327 n. 4 ("A terre tenant is ... 'one who purchases and takes land subject to the existing lien of a mortgage or judgment against a former owner'. [sic] Black's Law Dictionary, at p. 1642 (4th Ed. 1968, citing Pennsylvania law)."). They have been granted a deed to the Prem-

ises which the Wife has testified has been recorded, and Equity was admittedly notified of same by the Debtors' counsel on November 13, 1997. The statutes quoted above, 21 P.S. §§ 733–34, also provide terre tenants with a right to pay off the mortgage on their property, and obligates Equity to recognize the assignment at issue. Subsequent Pennsylvania law, *i.e.,* Act 6, provides them with a right to cure defaults, just as it does Truitt, Equity's mortgagor.

As to the Debtors's rights arising under 41 P.S. §§ 403, 404, waiver is prohibited. 41 P.S. § 408. Therefore, whatever rights to refuse to accept the Debtors as mortgagees in lieu of Truitt that Equity could claim based on paragraphs 17 and 18 of the mortgage are unenforceable against the Debtors to the extent that these provisions conflict with 41 P.S. §§ 403, 404.

The cases which are relied upon by Equity which arise in jurisdictions other than Pennsylvania, such as *Nelson, Rye,* and the other cases collected in *In re Rutledge,* 208 B.R. 624, 627–28 (Bankr.E.D.N.Y.1997), are hence not only not controlling precedent, but are largely irrelevant in light of the specific applicable provisions of the controlling Pennsylvania law. *But see Rutledge, supra,* 208 B.R. at 628–29 (despite absence of citation to any comparable New York law, court permits a non-mortgagor grantee debtor to cure arrears); and *In re Allston,* 206 B.R. 297, 298–99 (Bankr.E.D.N.Y.1997) (also under New York Law, non-mortgagor grantee debtors were permitted to pay off the mortgage balance in a Chapter 13 plan).

Of course, any Pennsylvania cases in this line would apparently be relevant to our discussion. We note, however, that relief was not granted to the respective mortgagees in either *Taylor, supra;* or *McLaughlin, supra.* Moreover, both cases involved conveyances to debtors *post*-petition, rather than pre-petition, as here. Moreover, both decisions predated both the enactment of the new § 1322(c) and the decision in *Marra,* which overruled the seemingly controlling contrary precedents in *Trunk, supra;* and *Goldsworthy, supra. See Marra,* 532 Pa. at 193–94, 615 A.2d at 329, as quoted at page 383 *supra.* As the Debtors point out, although *In re*

*Walker,* 171 B.R. 197, 209 (Bankr.E.D.Pa. 1994), cites many of the foregoing cases, its facts are clearly distinguishable because the *Walker* debtor no longer claimed to be an owner of the property at the time that he argued that he was protected by the automatic stay.

We are aware of several unreported decisions, by us and other judges of this court, which have refused to permit putative non-mortgagor grantee-debtors to cure mortgage defaults. We note that most, if not all, of these cases involved debtors who had not obtained deeds to the properties at issue, either pre-petition or post-petition. This factor would fail to trigger the protections of Act 6 or 21 P.S. §§ 733–34. We also note, with some chagrin, that, like apparently all of the interested parties in this case, we were unaware of the full extent of the *Marra* decision or the existence of 21 P.S. §§ 733–34 at the time of the hearing. We note that none of the parties make reference to these authorities in their briefs.

This enlightenment may temper not only the stance of the Trustee and the positions of Equity and the U.S. Trustee, but also has tempered our own rather strong criticism of the Debtors' tactics at the hearing. It is of course true that Truitt and the Debtors evaded the impact of 11 U.S.C. § 109(g)(2) by effecting the last-minute transfer of the Premises from Truitt to the Debtors. However, had Truitt simply allowed her case to be "involuntarily" dismissed, § 109(g)(2) would have never come into play. *See Walker, supra,* 171 B.R. at 202–03. Thus, if Truitt had proceeded to suffer involuntary dismissal and then simply have refiled a new case, it is doubtful that any hubbub would have arisen.

This court is not inclined to find *two* serial bankruptcy cases abusive.

While our disfavor with the Debtors' conduct is diminished by the foregoing, it has not entirely abated. Perhaps unfairly to these Debtors, we perceive a downside in opening the door to convenient, pre-petition conveyances of properties to relatives, children, friends, or others by former debtors desperate to avoid bar orders in the extraordinary instances where such orders are justified. We will therefore continue to impose the conditions of our interim order of December 12, 1997, upon the Debtors through confirmation, which is now scheduled on April 21, 1998. Although the Plan appears potentially confirmable [4] for the reasons stated herein, there are always potential pitfalls, some of which are foreseeable (suppose the deed is not recorded!) and some of which may not be.

## D. CONCLUSION

An order consistent with the conclusions expressed in the foregoing Opinion will be entered.

### ORDER

■ AND NOW, this 7th day of January, 1998, after a hearing of December 11, 1997, on the Motion ("the Motion") of Equity One, Inc. ("Equity") to dismiss this case or, in the alternative, for relief from the automatic stay to foreclose upon a premises at 63 Roving Road, Levittown, Pennsylvania 19056 ("the Premises"), and upon consideration of the arguments and post-trial submissions of the parties, it is hereby ORDERED AND DECREED as follows:

---

4. It appears, in light of our discussion at page 384 *supra,* the Debtors could propose a "cure" plan, as they have, rather than, as Equity suggests, being confined to a "pay off" plan. We make two further observations: (1) the mortgage at issue was executed after October 22, 1994, thereby apparently eliminating Equity's right to interest on arrears. *See* 11 U.S.C. § 1322(e); and (2) a "cramdown payoff" plan is apparently not out of the Debtors' reach. The security interest of Equity, including future improvements and fixtures on the property, would appear to remove the mortgage at issue from the protection of 11 U.S.C. § 1322(b)(2). *See In re Hammond,* 27 F.3d 52 (3d Cir.1994); *Sapos v. Provident Institu-*tion of Savings in Town of Boston, 967 F.2d 918, 925–27 (3d Cir.1992); and *In re Bernhardt,* 186 B.R. 889, 890–91 (Bankr.E.D.Pa.1995). This factor would reduce the Debtors's payoff obligation to the value of the Premises, which was, per the Wife, not more than the $132,000 purchase price. Assuming deferral interest at nine (9%) percent per annum would require interest payments totalling approximately $32,000. If the total sum of $164,000 were paid directly to Equity to avoid the Trustee's commission, a payment of about $2,800 monthly would suffice. The Debtors' payment obligation to Equity under the Plan varies between $1,600 and $1,800 month, which is not appreciably less.

1. The sheriff's sale of the Premises, presently scheduled on January 9, 1998, is STAYED indefinitely pending any further orders of this court granting Equity the relief pursuant to the terms of this order or any other further order of this court.

2. Through the date of confirmation, the automatic stay shall remain in effect, subject to our granting relief from the automatic stay if the Debtors fail to perform any of the conditions set forth in paragraph 3.

3. The Debtors shall

   a. Make monthly mortgage payments of $1,108.98 to Equity on or before the 15th day of each successive month or the first business day thereafter.

   b. Make payments to the Trustee in accordance with any plan proposed at that time on or before the 25th day of each successive month or the first business day thereafter.

4. If Equity believes that the Debtors have not performed any of the conditions set forth in paragraph 3 *supra*, it may provide written notice to the Debtors and their counsel listed below and, if performance is not made to the satisfaction of Equity and the Debtors do not file an expedited Motion for relief from this Order within ten (10) days, Equity may certify same to the court and obtain an Order dismissing this case under the terms set forth in paragraph 5 *infra*.

5. In light of the somewhat doubtful circumstances of this filing, if this case is dismissed at any time prior to confirmation, Marie E. Truitt, the Debtors, and any other transferee of the Premises or person acting on their behalf, will be barred from filing another case for at least 180 days, without prior permission from the court after notice to Equity.

6. If no relief is granted to Equity pursuant to paragraph 4 of this Order, and a plan is confirmed, the automatic stay shall remain in full force and effect.

7. Since we have decided what further order should be entered in this case, the status hearing scheduled on January 8, 1998, in our Order of December 12, 1997, is CANCELLED.